# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued September 8, 2016   Decided March 31, 2017

No. 16-5011

JIHAD DHIAB, DETAINEE, GUANTANAMO BAY NAVAL
STATION AND SHAKER AAMER, AS NEXT FRIEND OF JIHAD
DHIAB,
APPELLEES

v.

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL.,
APPELLANTS

HEARST CORPORATION, ET AL.,
APPELLEES

---

Consolidated with 16-5012

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:05-cv-01457)

---

*Catherine H. Dorsey*, Attorney, U.S. Department of Justice, argued the cause for respondents-appellants/cross-appellees (US). With her on the briefs were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Matthew M. Collette*, Attorney.

*David A. Schulz* argued the cause for intervenors-appellees/cross-appellants. With him on the briefs was *Matthew L. Schafer*.

*Rachel B. Levinson-Waldman* was on the brief for *amici curiae* Brennan Center for Justice and Electronic Frontier Foundation in support of intervenors-appellees.

*Hina Shamsi* and *Arthur B. Spitzer* were on the brief for *amici curiae* American Civil Liberties Union of the Nation's Capital and The Reporters Committee for Freedom of The Press in support of intervenors-appellees/cross-appellants.

Before: ROGERS, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH, with whom *Circuit Judge* ROGERS and *Senior Circuit Judge* WILLIAMS join except as to Part II.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

RANDOLPH, *Senior Circuit Judge*: The government's appeal, and the intervenors' cross-appeal, are from the district court's orders releasing video recordings made at the United States Naval Base, Guantanamo Bay, Cuba. The recordings are of military personnel removing a detainee from his cell, transporting him to a medical unit, and force-feeding him to keep him alive while he was on a hunger strike.

The government classified these recordings as "SECRET" because disclosing them could damage the national security. The district court decided that under the Constitution the public has a right to view the recordings because the detainee's attorney filed some of them under seal, at which point the recordings became part of the court's record. The government's appeal is on the ground that the public has no such constitutional right. The intervenors' cross-appeal is on the ground that several categories of redactions the court approved prior to public release were too extensive.

## I.

The case began when Abu Wa'el (Jihad) Dhiab filed a petition for a writ of habeas corpus to prevent the government from force-feeding him. The district court denied Dhiab's motion for a preliminary injunction, finding that it lacked habeas jurisdiction to correct conditions of confinement. *Dhiab v. Obama*, 952 F. Supp. 2d 154, 155 (D.D.C. 2013). On appeal, a panel of this court held that a Guantanamo habeas petitioner may seek not only relief from confinement, the traditional remedy in habeas corpus, but also an injunction to alter the conditions of his confinement. *Aamer v. Obama*, 742 F.3d 1023, 1033 (D.C. Cir. 2014).[1]

On remand, Dhiab moved again for a preliminary injunction, this time challenging particular government force-feeding practices. He also filed an emergency application for a temporary restraining order. The district court denied both

---

[1] There is a conflict in the circuits regarding whether complaints about conditions of confinement are cognizable in habeas cases. *Aamer*, 742 F.3d at 1036-38. *See also Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016); *Spencer v. Haynes*, 774 F.3d 467, 470 n.6 (8th Cir. 2014).

motions. *Dhiab v. Obama*, 74 F. Supp. 3d 16, 19 (D.D.C. 2014); Order, *Dhiab v. Obama*, No. 05-01457 (GK), (D.D.C. June 16, 2014), ECF No. 254. In considering Dhiab's motions, the district court ordered the government to provide Dhiab's attorney, who had been given a security clearance, copies of the video recordings, the existence of which the government had disclosed. After the government complied with the order, to which it objected, Dhiab's attorney filed some of the recordings under seal.[2]

The government recorded Dhiab's removal from his cell and his force-feeding in order to train military guards about how to handle detainees in such circumstances. In classifying each recording as "SECRET," we shall assume that the government complied with Executive Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).[3] This Executive Order, and those of past Presidents, *see Dep't of Navy v. Egan*, 484 U.S. 518, 527-28 (1988), specified three levels of classified national security information: "TOP SECRET," "SECRET," and "CONFIDENTIAL." The "SECRET" classification is reserved for "information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security" of the United States. Exec. Order No. 13,526

---

[2] The classified recordings were sealed as required by the general protective order governing all Guantanamo Bay detainee litigation. *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143, 153 (D.D.C. 2008). The district court issued a supplemental protective order governing the recordings. That order prevented Dhiab's counsel from sharing the recordings with counsel representing detainees who were not challenging the forcible cell-extraction and enteral-feeding procedures.

[3] The intervenors did not claim, let alone establish, that the classification of the recordings was improper. The district court expressed no opinion on the subject.

§ 1.2(a)(2). Unauthorized disclosure of such classified information can be a federal criminal offense. *See, e.g.*, 18 U.S.C. § 793.

Press organizations – sixteen of them – sought to intervene in Dhiab's habeas case and asked the district court to unseal the recordings Dhiab's attorney had filed. Their motion asserted that under the First Amendment, and common law, the public had a right to see these recordings because the recordings had become part of the record of Dhiab's habeas corpus proceeding. The government did not oppose their intervention motion but it did oppose the organizations' motion to unseal the recordings. In support of its opposition, the government filed declarations from military officers explaining how release of the classified recordings would threaten national security.

In October 2014, the district court granted the organizations' motion to intervene and their motion to unseal the recordings, subject to further proceedings to determine what portions of the recordings should be redacted to protect information identifying government personnel. *Dhiab v. Obama*, 70 F. Supp. 3d 486, 501 (D.D.C. 2014).

In December of that year, the government released Dhiab from Guantanamo and transferred him to the control of the government of Uruguay, thus rendering his habeas petition moot.

Our court nevertheless heard the government's appeal from the district court's October 2014 order unsealing the recordings and determined that we lacked appellate jurisdiction. We lacked appellate jurisdiction because the district court's ruling was not an appealable final order or an appealable collateral order in light of further proceedings the court had scheduled. *Dhiab v. Obama*, 787 F.3d 563, 565-66 (D.C. Cir. 2015). We encouraged

the district court on remand to consider the government's additional declarations, filed in support of a stay of the unsealing order pending that appeal. *Id.* at 567. These new declarations "set out the harm associated with release of the videotapes in considerably more detail" than the earlier ones. *Id.*

When the case returned to the district court, it denied the government's motion for reconsideration and, over the government's objection, ordered the recordings[4] released after the government redacted identifying information such as faces, voices and names of government personnel. *Dhiab v. Obama*, 141 F. Supp. 3d 23, 28-29 (D.D.C. 2015). By then Dhiab was no longer at Guantanamo.[5] Even so, the intervenors persisted in their objections to some of the redactions and sought reinstatement of some of the deleted audio portions of the recordings or a transcript and subtitles.[6] The district court

---

[4] There is some discrepancy about the number of recordings at issue. The district court's initial opinion referred to twenty-eight recordings already on file, but noted that the government had provided Dhiab with an additional four recordings. *Dhiab*, 70 F. Supp. 3d at 492. The opinions on remand refer to thirty-two recordings. *Dhiab v. Obama*, 141 F. Supp. 3d 23, 27 (D.D.C. 2015); *Dhiab v. Obama*, 151 F. Supp. 3d 28, 29 (D.D.C. 2015).

[5] Dhiab did not file a brief in this appeal.

[6] The government first redacted a mutually selected sample of ten recordings – eight of the thirty-two recordings produced during litigation and a compilation recording created by each party. In addition to covering guards' faces, uniform patches and other unique identifiers, the government muted the audio whenever a guard was speaking. After viewing the set of eight redacted recordings, Dhiab's counsel objected to the muting of guards' voices and requested that the audio redactions be limited. In the alternative, Dhiab's counsel requested the addition of subtitles and the simultaneous release of a

denied the intervenors' motion regarding redaction, *Dhiab v. Obama*, 151 F. Supp. 3d 28, 29 (D.D.C. 2015), ordered the redacted recordings unsealed on or before January 11, 2016, and granted a stay pending this appeal and cross-appeal, Order, *Dhiab v. Obama*, No. 05-01457 (GK), (D.D.C. Jan. 4, 2016), ECF No. 418.

**II.**

The intervenors' claim that the Constitution requires this national security information, properly classified as "SECRET," to be divulged to the world because a lawyer representing a Guantanamo detainee filed some of the recordings under seal in his client's now-moot habeas corpus action is untenable. It is important to bear in mind that the Constitution gives "the President as head of the Executive Branch and as Commander in Chief" the "authority to classify and control access to information bearing on national security . . .." *Egan*, 484 U.S. at 527.

Through the years our government has been steadfast in protecting information that, if made public, would jeopardize the security of the United States. Statutes, longstanding regulations, comprehensive Executive Orders, rules of the Chief Justice of the United States, local rules and practices of the federal courts – and more, enforce and support the President's constitutional duty to prevent our government's secret information from seeing the light of day, in judicial proceedings or otherwise.

Here the government established that the recordings of Dhiab were properly classified as "SECRET." The district court did not rule otherwise, and the intervenors did not claim, let

---

transcript. The intervenors, who have not seen the recordings, joined this motion.

alone show, that the classifications were improper. The government submitted declarations, about which more later, demonstrating the harm that would result from releasing any of these recordings, redacted or not.

Yet the intervenors insist that under the First Amendment, classified information submitted under seal in a judicial proceeding becomes fair game for a judicial disclosure order, such as the one the district court issued in this case. Neither the First Amendment nor any other provision of the Constitution stands for such a principle.

The intervenors rely heavily on *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986).[7] This *Press-Enterprise II* decision will not bear the weight they place on it. The Supreme Court framed the question in *Press-Enterprise II* this way: whether the public had "a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution." *Id.* at 3. The Court put the question in terms of the public's right because the "First Amendment generally grants the press no right to information about a trial superior to that of the general public." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 609-10 (1978) (citing *Estes v. Texas*, 381 U.S. 532, 589 (1965) (Harlan, J., concurring); *Saxbe v. Washington Post Co.*, 417 U.S. 843 (1974); *Pell v. Procunier*, 417 U.S. 817 (1974); and *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965)).

*Press-Enterprise II* discovered a constitutional right in the public, although it was a qualified one: such proceedings may be

---

[7] *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 558-81 (1980) (opinion of Chief Justice Burger, joined by Justices White and Stevens), *id.* at 584-98 (opinion of Justice Brennan, joined by Justice Marshall).

sealed but only if "specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" 478 U.S. at 13-14 (quoting *Press-Enterprise Co. v. Super. Ct.* (*Press-Enterprise I*), 464 U.S. 501, 510 (1984) (considering the closure of *voir dire* in a criminal trial)). The district court invoked this formulation in ordering the classified Guantanamo recordings unsealed. *Dhiab*, 70 F. Supp. 3d at 493.

*Press-Enterprise II* is not comparable to this case. Two differences are immediately apparent. When the Court wrote of the importance of public access to evidentiary proceedings it could not possibly have had in mind classified national security information. The case came up from a California state court. In criminal cases in California a preliminary hearing functioned "much like a full-scale trial." 478 U.S. at 7. The sealed record in *Press-Enterprise II* consisted of testimony and exhibits relating to murder charges, not classified material. *Id.* at 4.

The second difference is just as obvious. Unlike Dhiab's case, which was civil in nature,[8] the underlying action in *Press-Enterprise II* was a criminal prosecution. When it comes to classified national security information the Supreme Court has decided that the distinction makes a difference. *See United States v. Reynolds*, 345 U.S. 1, 12 (1953). In criminal cases, the government initiates the prosecution. Access and disclosure rights in criminal cases "do not endanger the government's paramount interest in national security. The government's interest can be protected by dismissal of the prosecution or less drastic concessions by the government in a criminal case." Bruce E. Fein, *Access to Classified Information: Constitutional*

---

[8] *See, e.g.*, *Fay v. Noia*, 372 U.S. 391, 423 (1963), deciding that the writ of habeas corpus is a "civil remedy for the enforcement of the right to personal liberty" not "a stage of" a criminal proceeding.

*and Statutory Dimensions*, 26 WM. & MARY L. REV. 805, 828 (1985).[9]   Matters are quite different in civil cases: "the Government is not the moving party, but is a defendant . . .." *Reynolds*, 345 U.S. at 12.  For this reason, the Court in *Reynolds* held that the rationale behind access to national security information in criminal cases had "no application in a civil forum."  *Id.*[10]   For the same reason, a noted commentator concluded that "plaintiffs suing the United States enjoy no right of access to classified information pertinent to the litigation." Fein, *supra*, at 828.

There are additional reasons why *Press-Enterprise II* does not apply to this case.  To reach its result, the Supreme Court recounted the English tradition of public criminal trials,

---

[9] The Classified Information Procedures Act, 18 U.S.C. app. 3, (CIPA) governs the handling of classified evidence in criminal proceedings.  CIPA was enacted to limit the practice of criminal defendants threatening to disclose classified information in order to force the government to dismiss the charges.  Under CIPA the court may review the admissibility of classified evidence at a preliminary hearing held *in camera.  Id.* § 6(a).  If the classified information is admissible, the government can suggest a substitute for the information or concede the fact the information tends to prove.  *Id.* § 6(c).  If the court rejects these measures, the government may declassify the information or dismiss the prosecution.  *Id.* § 6(e).

[10] We also have recognized the difference between criminal and civil proceedings: "Neither the Supreme Court nor this Court has applied the [First Amendment right of access] outside the context of criminal judicial proceedings or the transcripts of such proceedings." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003).

11

beginning – the Court wrote – before the Norman conquest.[11] *Press-Enterprise II*, 478 U.S. at 8. Although the Court did not say as much, the idea apparently was that the Framers of the First Amendment must have had this history in the back of their collective minds. *See Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 604-05 (1982).[12] The Court cited no historical

---

[11] We wrote in *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 502 (D.C. Cir. 1998):

> The Supreme Court ruled in *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979), that the First Amendment did not entitle members of the media to attend a pretrial suppression hearing, at least so long as they could receive copies of the transcript at a later date after the danger of prejudice to the defendant had passed. The Court reached the opposite conclusion in *Press–Enterprise Co. v. Superior Court (Press–Enterprise II)*, 478 U.S. 1, 12, 13 (1986), holding that a "qualified First Amendment right of access attaches to preliminary hearings in California"—that is, probable cause hearings "sufficiently like a trial to justify" the conclusion that they should be open. One of the main differences between the two cases was that although the "near uniform practice of state and federal courts has been to conduct preliminary hearings in open court," *Press–Enterprise II*, 478 U.S. at 10; *see also id.* at 8, the Court in *Gannett* could identify no long-standing tradition of public access to pretrial suppression hearings. 443 U.S. at 384–93.

[12] *See Richmond Newspapers, Inc. v. Virginia* in which the Chief Justice explained that history was important because it showed that the "Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open." 448 U.S. at 575 (Burger, C.J., plurality opinion). The Court gave the same explanation in *Press-Enterprise I*, 464 U.S. at 509 n.8. Justice Stevens, in his dissenting opinion in *Press-Enterprise II*, pointed out that "in our prior cases history mattered primarily for what it revealed about the intentions of the Framers and ratifiers of the First Amendment." 478 U.S. at 22.

12

evidence supporting that proposition and the wording of the First Amendment reveals no such understanding, as the Court itself acknowledged in an earlier opinion. *Id.* at 604. "With neither the constraint of text nor the constraint of historical practice, nothing would separate the judicial task of constitutional interpretation from the political task of enacting laws currently deemed essential." *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) (Scalia, J.).

In habeas corpus cases, there is no tradition of public access comparable to that recounted in *Press-Enterprise II* with respect to criminal trials.[13] Habeas corpus proceedings do not involve juries. Since the beginning they have been decided by judges. Early English courts were in session for only a few months each year. PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 355 n.79 (2010). Yet from the fifteenth to eighteenth century, English courts regularly adjudicated habeas petitions between sessions. *Id.* at 56-57. At such times the English judges required jailers to make their returns to the writ to the judge's private chambers or to the judge's home. *Id.* at 54. The judge then made his habeas decision in private. *Id.* Between 1500 and 1800, about one-fifth of the writs the judges of England issued required the jailer make the return to chambers. *Id.* Although English judges more frequently requested returns to chambers during the vacations, the practice also occurred during terms of court. *Id.* The Habeas Corpus Act of 1679, which Blackstone described as the bulwark of English liberties, 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 133 (1765), expressly authorized the courts to issue

---

[13] The district court here, *Dhiab*, 70 F. Supp. 3d at 494, and in *In re Guantanamo Bay Detainee Litigation*, 624 F. Supp. 2d 27, 35 (D.D.C. 2009), lamented the lack of any discussion in the caselaw of this subject.

writs of habeas corpus during vacations, thus continuing this longstanding practice. 31 Car. 2 c. 2.

Of course in this country, proceedings in open court are the norm, although there are well-established exceptions. *See, e.g.*, *In re Motions of Dow Jones & Co.*, 142 F.3d at 502-05. But of importance here is not just the absence of any "unbroken, uncontradicted history" of public attendance at habeas corpus proceedings in eighteenth-century England. *Richmond Newspapers*, 448 U.S. at 573 (Burger, C.J., plurality opinion). More significant is that from the beginning of the republic to the present day, there is no tradition of publicizing secret national security information involved in civil cases, or for that matter, in criminal cases.[14] The tradition is exactly the opposite.[15]

To appreciate this one need only consider what occurs when classified information might be revealed during an oral

---

[14] *See United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir. 1997) ("Assuming that the *Press-Enterprise II* right of access extends to at least some types of judicial documents, the question remains whether that right applies to the *particular* types of documents at issue in this case."); *In re Grand Jury Subpoena*, 103 F.3d 234, 242 (2d Cir. 1996) (holding that under *Press-Enterprise II*, the court must focus on the specific motion that the moving party seeks to disclose publicly, not the broader grand jury investigation or hearings in which the motion arose).

[15] *See, e.g.*, *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983): "As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. *See, e.g.*, *Houchins v. KQED, Inc.*, 438 U.S. 1, 8-9 (1978) (plurality opinion); *id.* at 16 (Stewart, J., concurring); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 849 (1974); *Pell v. Procunier*, 417 U.S. 817, 831-32 (1974)."

argument in our courtroom. In such cases the court's security officer "seals" the courtroom – that is, excludes the public, including the press. This is done not only in criminal appeals but also in civil cases. The procedures followed are those the Chief Justice of the United States has prescribed to protect classified information in criminal cases pursuant to the Classified Information Procedures Act. 18 U.S.C. app. 3 § 9 note (Security Procedures Established Pursuant to Pub. L. No. 96-456, 94 Stat. 2025, by the Chief Justice of the United States for the Protection of Classified Information). One may be confident that over many years none of the members of our court, past and present, ever supposed that in complying with the Chief Justice's rules, we were somehow violating the Constitution.

Add to *United States v. Reynolds*, already mentioned, the case of *Totten v. United States*, 92 U.S. 105 (1875).[16] Both of these civil cases are well-known instances in the long history of protecting national security secrets of the United States.[17] *Reynolds* held that in a suit against the government, the plaintiff had no right to discover military or state secrets; the privilege against revealing such information was, the Court wrote, "well established." 345 U.S. at 6-7. The Court in *Reynolds* described its 1875 decision in *Totten* as having dismissed a civil suit, the subject of which was a "state secret." *Id.* at 11 n.26. In *Reynolds*, even if the plaintiffs' need for the information had been "compelling," no showing of necessity could justify a court order requiring the government to reveal "military secrets." *Id.* at 11. Relying on *Reynolds*, our court has held that in order to

---

[16] *See generally* Daniel L. Pines, *The Continuing Viability of the 1875 Supreme Court Case of* Totten v. United States, 53 ADMIN. L. REV. 1273 (2001).

[17] *See* Fein, *supra*, at 828-31.

protect national security information, the district court "need only be satisfied that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978) (internal quotation and emphasis omitted).

The government also discusses cases arising under the Freedom of Information Act. Although this legislation requires much government information to be disclosed to the public, Congress expressly exempted properly classified information. 5 U.S.C. § 552(b)(1). To determine whether the government's classification was proper, the court may review the document itself, but only *ex parte* and *in camera, see* 5 U.S.C. § 552(a)(4)(B) – that is, in private – as we mentioned in a case dealing with information regarding detainees at Guantanamo. *ACLU v. Dep't of Def.*, 628 F.3d 612, 626-27 (D.C. Cir. 2011). If the government had properly classified the document, the litigant, and hence the public, had no right to see it.

In *Boumediene v. Bush*, the case establishing the right of Guantanamo detainees to bring habeas actions, the Court thought the unique proceedings it was authorizing might risk "widespread dissemination of classified information." 553 U.S. 723, 796 (2008). To guard against this the Court wrote that the government "has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible. *Cf. United States v. Reynolds*, 345 U.S. 1, 10 (1953) (recognizing an evidentiary privilege in a civil damages case where 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged')." *Boumediene*, 553 U.S. at 796.

To that end, Guantanamo habeas proceedings have been litigated under orders designed to protect classified information. *See, e.g.*, *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 143 (D.D.C. 2008). These protective orders require not only that classified information be maintained under seal, but also that counsel (with a security clearance) not disclose classified information at any hearing or proceeding. *Id.* at 150, 153. The government informs us that Guantanamo habeas cases routinely involve closed sessions to protect classified information from the public eye. Appellants' Reply Br. at 20. Dhiab's case is no exception: in his habeas proceedings, the district court held an evidentiary hearing from which the public was excluded. *Id.* at 21.

As against this, the intervenors are unable to cite a single case in which a court – other than the district court here – found that the First Amendment compelled public disclosure of properly classified national security information in a habeas proceeding, or in any other type of civil proceeding.

*Press-Enterprise II* spoke of a need to take into account "experience and logic" in determining whether the First Amendment required a record of a judicial proceeding to be released to the world. 478 U.S. at 9. The "experience" in habeas corpus cases and in cases involving classified documents have already been discussed.

As to "logic," it is important to remember that logic does not give starting points. First principles do. For this case the starting point was established at the Founding. The preamble to the Constitution gives equal billing to the national defense and "the Blessings of Liberty." U.S. CONST. pmbl. As the Supreme Court stated, there is no higher value than the security of the nation, a value the Court deemed a "compelling interest." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (internal quotation omitted).

17

*Press-Enterprise II* therefore does not apply to this case and neither the intervenors nor the public at large have a right under the First Amendment to receive properly classified national security information filed in court during the pendency of Dhiab's petition for a writ of habeas corpus.

**III**.

Even if the intervenors had a qualified First Amendment right of access to the Dhiab recordings, we would still reverse the district court's decision. The court's ruling that the government failed to show a "substantial probability" of harm to a higher value was clear error.[18] *Press-Enterprise II*, 478 U.S. at 14 (internal quotation omitted).

The government identified multiple ways in which unsealing these recordings would likely impair national security. Two of these risks – detainees triggering forcible encounters and developing countermeasures – together and individually, were enough to prevent these recordings from becoming public. The government's declarations explained that the recordings would enable detainees, assisted by outside militants, to develop countermeasures to the guards' cell-extraction and enteral-feeding techniques. The district court dismissed this prospect because the government had "already released substantial

---

[18] This court has not decided the proper standard of review for a district court's "compelling interest" analysis. The circuits disagree about whether to apply the ordinary "clear error" standard, FED. R. CIV. P. 52(a)(6), or "de novo" review in light of *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 508-10, 508 n.27 (1984). *See, e.g.*, *United States v. Erie Cty.*, 763 F.3d 235, 238 (2d Cir. 2014); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 174-75 (5th Cir. 2011). We need not decide this issue because we would reverse even if the standard were clear error.

information" about these procedures and the detainees were already "intimately familiar" with them. *Dhiab*, 70 F. Supp. 3d at 497-98. The government's declarations contradict the court's assessment. The recordings of the feeding process contain "significantly more information than previously released imagery," Declaration of Rear Admiral Kyle J. Cozad, October 15, 2014, ¶ 4, and the publicly released information about cell extractions was outdated and described techniques not being used at Guantanamo. *Id.* ¶¶ 5-6. The recordings also show elements of the procedures that "take place outside the detainee's presence" or "shielded from the detainee or otherwise obstructed from view." Declaration of Rear Admiral Richard W. Butler, ¶ 12; Declaration of Rear Admiral Kyle J. Cozad, November 26, 2014, ¶ 9.

The government's expert judgment was that militants could study the recordings repeatedly and slowly, looking for "patterns" of "mistakes" not identifiable from first-hand experience or written descriptions. *Id.* ¶ 14. Even if the recordings contained no new information, the government thus demonstrated good cause for sealing them. Information gleaned from the recordings could reach current detainees, who communicate with family members and other outside persons and have some access to outside media. *Id.* ¶ 6. Militants could also use the recordings to train fighters the government may capture and detain in the future. *Id.* ¶ 18. When detainees resist what are already hazardous procedures for the guards, this could further endanger government personnel at Guantanamo. Guards have been kicked, grabbed, punched, knocked down, bitten, and sprayed with bodily fluids. *Id.* ¶ 7. The government's interest in ensuring safe and secure military operations clearly overcomes any qualified First Amendment right of access.

Rear Admiral Richard W. Butler identified a related danger: "If video recordings of forced cell extractions, or portions

thereof, must be released to the public, detainees would surely become aware of this, and some likely would respond by refusing to comply with requests of the guard force in the hope that such resistance would result in forced cell extractions that would be recorded by video and released to the public, thus providing terrorist elements with propaganda to fuel their continued global hostilities against the United States." Declaration of Rear Admiral Richard W. Butler, ¶ 18.

At the time of his declaration, Rear Admiral Butler was the Commander of the Joint Task Force-Guantanamo. He made his declaration on personal knowledge. The district court, calling his statement "speculative," thought it knew better. *Dhiab*, 70 F. Supp. 3d at 500. According to the court, detainees will not act as predicted because the court's decision will not give all "detainees the unilateral right to publicize recordings." *Id.* at 501. This misses an important point. The concern was that other detainees will *believe* courts *may* disclose recordings of their behavior. Needless to say, the district court had no day-to-day experience with the people being detained at Guantanamo and had no special insight into their mindset. Rear Admiral Butler did.

The government also explained in detail the risk that extremists would use the recordings to incite violence against American troops abroad and as propaganda to recruit fighters. The recordings are "particularly subject to use" because they depict "a forcible interaction between . . . personnel and the detainees." Declaration of Rear Admiral Sinclair M. Harris, ¶ 12. Images are more provocative than written or verbal descriptions. Extremists have used Guantanamo Bay imagery in their propaganda and in carrying out attacks on Americans. *Id.* ¶¶ 8,10. For example, the Islamic State beheaded American journalists wearing orange jumpsuits commonly associated with Guantanamo Bay detainees. *Id.* ¶ 8. In his forced final

statement before his execution, Steven Sotloff, one of the journalists, was forced to mention the continued operation of Guantanamo as a reason why he was about to be murdered. *Id.*

The district court disregarded this evidence as legally irrelevant under the "heckler's veto" line of cases, which prevents the government from censoring speech because the speech may provoke violence or offend others. *See Dhiab*, 70 F. Supp. 3d at 500 (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992)). Those cases are irrelevant. The government cited this substantial probability of harm to national security in order to overcome a qualified First Amendment right of access, not as a justification for suppressing speech. Risks of violent attacks by third parties against a cooperating defendant can justify sealing a plea agreement. *See Washington Post v. Robinson*, 935 F.2d 282, 291-92 (D.C. Cir. 1991). And the government unquestionably can classify documents based on the risk our enemies will use them to incite violence. *Judicial Watch, Inc. v. United States Department of Defense*, 715 F.3d 937, 943 (D.C. Cir. 2013), so held.

It bears repeating that the government "has a *compelling* interest in protecting . . . the secrecy of information important to our national security . . .." *McGehee*, 718 F.2d at 1143 (*quoting Snepp v. United States*, 444 U.S. at 509 n.3 (per curiam) (emphasis and alteration in original)). *See also C.I.A. v. Sims*, 471 U.S. 159, 175 (1985); *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989). The district court did not disagree with the "SECRET" classification of these recordings, and neither did the intervenors. By definition, "the unauthorized disclosure of [the recordings] reasonably could be expected to cause serious damage to the national security." Executive Order No. 13,526 § 1.2 (a)(2). The district court had no basis for ruling that publicly releasing the recordings could not be expected to cause such harm.

The district court did not reach the intervenors' common-law claim because it ruled in their favor on the basis of the First Amendment. *Dhiab*, 70 F. Supp. 3d at 492 n.2; *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. at 598-99. The law of this circuit is that the need to "guard against risks to national security interests" overcomes a common-law claim for access. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980). Because keeping the recordings sealed is narrowly tailored to protect the government's compelling interest in guarding national security, intervenors cannot prevail on their common-law claim. *See Wash. Post*, 935 F.2d at 288 n.7; *see also McVeigh*, 119 F.3d at 812.

Because the recordings will remain sealed, the intervenors' cross-appeal about the extent of the redactions is dismissed as moot.

*Reversed.*

ROGERS, *Circuit Judge*, concurring in part and concurring in the judgment. Like Judge Williams, I would apply the experience and logic analysis of *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enterprise II*"), and so my conclusion about when the government's interest in protecting information classified as SECRET will outweigh the public's First Amendment interest is more tentative than Judge Randolph's. At the same time, I tend to be less tentative than my colleagues about the nature of the historical background and the level of generality properly used in the analysis. Still, these analytical differences aside, the court is in agreement that the district court's order making the redacted SECRET videotapes public must be reversed. *See* Op. at 1 (Williams, J.); Op. at 16–21 (Randolph, J.). I offer a few observations on my approach.

Although neither the Supreme Court nor this court has applied the qualified First Amendment right of access to judicial civil proceedings, in *Press-Enterprise II*, the Supreme Court explained that the access right extends to any judicial proceeding where there is a "tradition of accessibility" and "public access plays a significant positive role in the functioning of the particular process in question." 478 U.S. at 8. The First Amendment guarantees the "rights to speak and to publish concerning what takes place at a trial." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576–77 (1980). The then-Chief Justice stated that "[w]hether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open." *Id.* at 580 n.17. By its terms, the experience and logic test does not limit the right of access to criminal proceedings. Every circuit to consider the issue has concluded that the qualified First Amendment right of public access applies to civil as well as criminal proceedings. *See Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684

F.3d 286, 298 (2d Cir. 2012); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253–54 (4th Cir. 1988); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984); *In re Iowa Freedom of Info. Council,* 724 F.2d 658, 661 (8th Cir. 1983); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983). Speaking for the Second Circuit, Judge Calabresi explained that the "recognition of the right to attend civil trials derives from the fact that the First Amendment, unlike the Sixth, does not distinguish between criminal and civil proceedings, nor does its distinguish among branches of government." *N.Y. Civil Liberties Union*, 684 F.3d at 298. "[O]nce unmoored from the Sixth Amendment, there is no principle that limits the First Amendment right of access" to criminal proceedings. *Id.* (internal quotation marks omitted). As Judge Williams observes, "the fact that habeas proceedings are formally civil is no obstacle to use of the experience-and-logic framework." Op. at 4 (Williams, J.).

Efforts to sow doubt about this conclusion and the conclusion of our sister circuits are unpersuasive because they fail, in part, to acknowledge an important distinction between a criminal defendant's rights and the public's role in advancing observance of those rights. Judge Randolph notes that in *United States v. Reynolds*, 345 U.S. 1 (1953), the Supreme Court distinguished between criminal and civil proceedings in addressing the government's invocation of the military secrets privilege to block the release of information that the government claimed involved national security. *See* Op. at 9–10 (Randolph, J.). But the Court did so in the context of highlighting that the government could not rely on the state secrets doctrine when it had prosecuted the defendant: "it is unconscionable to allow [the government] to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." *Reynolds*, 345 U.S. at

12. The distinction drawn by the Court arose in the context of protecting the rights of the accused, not to indicate that the public's right of access is more robust in criminal than in civil proceedings. Because the First Amendment right of access is enjoyed by the public, whether the "government is . . . the moving party" has little bearing on the First Amendment analysis. Op. at 10 (Randolph, J.) (quoting *Reynolds*, 345 U.S. at 12). The same is true of the Classified Information Procedures Act ("CIPA"), which Congress passed to "limit the practice of defendants threatening to disclose classified information in order to force the government to dismiss the charges." *Id.* at 10 n.9. Because the constitutional right of access belongs to third parties, laws governing the relationship between litigating parties are of little consequence to the application of *Press-Enterprise II* here.

Furthermore, in raising questions about the nature of the historical tradition and its level of generality, a word of caution is in order. *See* Op. at 5–7 (Williams, J.); Op. at 10–12 (Randolph, J.). At least as early as 1866, habeas applications were filed in open court in the United States. *Ex Parte Milligan*, 71 U.S. 2, 5 (1866)). It is true that in holding the right to attend criminal trials is implicit in the guarantees of the First Amendment, the Supreme Court in *Richmond Newspapers* traced "an unbroken, uncontradicted history" of public accessibility, 448 U.S. at 573, beginning prior to the Norman Conquest. But it is also true that the Court subsequently concluded in *Press-Enterprise II* that the practice of state and federal courts in the 19th century onward sufficed to establish a history of access to preliminary hearings in criminal cases. 478 U.S. at 10 (emphasis added); *see id.* at 22 (Stevens, J., dissenting) ("[I]t is uncontroverted that a common-law right of access did not inhere in preliminary proceedings at the time the First Amendment was adopted."). And in *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991), this court, joining

4

three other circuits, held that a qualified right of access applies beyond the criminal trial itself to executed plea agreements and related documents. Because "plea bargaining was probably nonexistent before 1800" in the United States, Mark H. Haller, *Plea Bargaining: The Nineteenth Century Context*, 13 LAW & SOC'Y REV. 273, 273 (1979); *see also* George Fisher, *Plea Bargaining's Triumph*, 109 YALE L.J. 857, 1017–24 (2000), this court apparently relied on post-ratification practices in concluding that "plea agreements have traditionally been open to the public." *Robinson*, 935 F.2d at 288. Yet my colleague suggests that pre-ratification practices should be the focus of our inquiry. *See* Op. at 10–12 (Randolph, J.).

The Supreme Court has not required there be a history of absolute accessibility to satisfy the "experience" prong; a "*near* uniform practice of state and federal courts" suffices. *Press-Enterprise II*, 478 U.S. at 10 (emphasis added); *see id.* at 10 n.3. There can be "gaps." Op. at 7 (Williams, J.). In *Press-Enterprise II*, the Court acknowledged an historical "tradition of accessibility" for state and federal preliminary hearings even though several states had "no historical counterpart," 478 U.S. 10 & n.3, and had only recently recognized a right of public access to preliminary hearings in view of their importance to the criminal trial. *Id.* at 10 n.3; *see also id.* at 24–25 (Stevens, J., dissenting). The Court contrasted grand jury proceedings, which have "traditionally been closed to the public," *id*. at 10, because their "proper functioning . . . depends upon the[ir] secrecy," *id.* at 9. Nonetheless, in relying on English history from the 16th to 18th centuries, my colleagues appear unpersuaded, surprisingly, that the overwhelming practice of open habeas corpus proceedings — at least 80% — establishes a sufficient tradition of accessibility. *See* Op. at 12 (Randolph, J.); Op. at 7 (Williams, J.). The author on whom they rely suggests that the in-chambers habeas practice may be explained by the limited terms of court, the need for prompt issuance of writs to ensure

compliance with court orders, and judicial vacations and travel — all when modern forms of communication were non-existent. PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 53–58 (2010). In other words, there was a well-settled expectation that habeas proceedings would be open to the public when the courts were in session.

Neither does this case present the occasion to define the meaning of "judicial record" in a manner contrary to the understanding of the district court and the parties, and how this court has viewed filings in habeas cases. *See* Op. at 2–3 (Williams, J.); *see also Parhat v. Gates*, 532 F.3d 834, 836 (D.C. Cir. 2008). No issue is presented to this court concerning the "judicial" nature of the SECRET videos filed by Dhiab's counsel in the district court. Even so, on its own terms, the suggested definition would appear to be overly restrictive, excluding from the category of "judicial records," for example, certain pleadings by a party. *See* FED. R. CIV. P. 7, 79.

As for the logic part of the *Press Enterprise II* test, it is true that there is no instruction manual as such for lower courts on "choosing the level of generality at which to assess the 'proceeding.'" Op. at 5 (Williams, J.). Supreme Court precedent is itself a guide, however, and it indicates that a high level of generality can be appropriate. In *Press-Enterprise II*, 410 U.S. at 10, the Court applied the experience and logic test to preliminary hearings in California, concluding that because "preliminary hearings conducted before neutral and detached magistrates" in other state and federal courts have traditionally been open, there was a tradition of access that applied to the California proceeding. The Court made no mention of the "substantial variations in the structure of the preliminary hearing as it is conducted throughout the country." Jesse H. Choper, *Consequences of Supreme Court Decisions Upholding Individual Constitutional Rights,* 83 MICH. L. REV. 1, 112

(1984) (quoting Y. KAMISAR, W. LAFAVE & J. ISRAEL, MODERN CRIMINAL PROCEDURE: CASES-COMMENTS-QUESTIONS 963 (5th ed. 1980)); *see also* Note, *The Function of the Preliminary Hearing in Federal Pretrial Procedure*, 83 YALE L.J. 771, 773–74 (1974).  For example, the New Hampshire Supreme Court, in ruling that hearsay was admissible at preliminary hearings, noted that the highest court in another state had taken a "contrary position," and that "[s]uch decisions are based upon different statutes, [and] a different view of the purpose of a probable cause hearing." *State v. St. Arnault*, 317 A.2d 789, 791 (N.H. 1974) (citing *Myers v. Commonwealth*, 298 N.E.2d 819 (Mass. 1973)).  By lumping together the various state and federal preliminary hearings when applying the experience and logic test, the Supreme Court suggests that a lower court may properly apply the test at a fairly high level of generality.  The writ of habeas corpus has never been a "static, narrow, formalistic remedy," *Jones v. Cunningham*, 371 U.S. 236, 243 (1963), but one whose scope and application has "changed depending upon the circumstances," *Boumediene v. Bush*, 553 U.S. 723, 779 (2008).  Taken together, that would mean viewing Dhiab's habeas proceeding as falling within the tradition of open habeas proceedings generally, rather than singling out habeas petitions filed by Guantanamo detainees for a separate test.

The qualified First Amendment right of access fits well with the privilege of habeas corpus, which was originally "one of the few safeguards of liberty specified in [the] Constitution." *Id*. at 739.  Because criminal trials and habeas proceedings are designed to protect against abuses of Executive power and guard individual liberty, why would the First Amendment right of access apply differently in the two proceedings?  "Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings: 'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.'" *N.Y. Civil Liberties Union*, 684 F.3d at 296

(quoting *In re Oliver*, 33 U.S. 257, 271 (1948) (quoting 1 Jeremy Bentham, RATIONALE OF JUDICIAL EVIDENCE 524 (1827))). The qualified right of public access plays a significant positive role in criminal proceedings by ensuring that "standards of fairness are being observed." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984); *see also Richmond Newspapers*, 448 U.S. at 569. In habeas proceedings, the absence of a jury, "long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased or eccentric judge[,] makes the importance of public access . . . significant." *Press-Enterprise II*, 478 U.S. at 12–13 (quoting *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968)). Also, "[t]o the extent the First Amendment embraces a right of access to criminal trials, it is to ensure that th[e] constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982) (internal quotation marks omitted); *see also Richmond Newspapers*, 448 U.S. at 576–77. Because the writ of habeas corpus is an important part of our Constitution and a "vital instrument for the protection of individual liberty," *Boumediene*, 553 U.S. at 743, the public's qualified right to informed discussion about its government would apply no less in these proceedings.

Nor is there reason to conclude that when the Supreme Court articulated the experience and logic test, "it could not possibly have had in mind classified national security information." Op. at 9 (Randolph, J.). The Court's test protects against threats to our nation's security by prohibiting disclosure when it will cause a "substantial probability" of harm to an "overriding interest." *Press-Enterprise II*, 478 U.S. at 7, 14. The right to access judicial proceedings "give[s] meaning to [the] explicit guarantees" of freedom of speech and press, *Richmond Newspapers*, 448 U.S. at 576, and the Court is well aware that First Amendment rights will often clash with national

security concerns, *see, e.g.*, *Dennis et al. v. United States*, 341 U.S. 494 (1951). Yet the Court crafted a test where the threshold First Amendment question is whether "the particular process in question" passes the experience and logic test, *Press-Enterprise II*, 478 U.S. at 8; *see also* Op. at 1, 4 (Williams, J.), not whether the records submitted in that proceeding contain classified information. Because the test accounts for the protection of national security information, the presence of such information in a judicial proceeding does not crowd out the decades-old and flexible approach set forth in *Press-Enterprise II*.

WILLIAMS, *Senior Circuit Judge*, concurring in part and concurring in the judgment: I join Parts I and III of Judge Randolph's opinion. I write separately to explain why I view the First Amendment analysis through a different lens than the one he applies in Part II of his opinion. While my approach leads to the same result as his, my conclusions are more tentative and my doubts more pronounced.

* * *

The Supreme Court has sketched a two-stage process for resolving whether the First Amendment affords the public access to a particular judicial record or proceeding. First the court must determine whether a "qualified First Amendment right of public access" exists. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986). If so, then the potential qualification comes into play, and the record or proceeding may be closed only if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 13-14. Assuming the existence of such a qualified right in this case, all members of the panel agree that the compelling national security considerations discussed in Part III of Judge Randolph's opinion render that right unavailable here.

But on the question of how to determine if that qualified right actually exists, we see things somewhat differently. In analyzing that issue, the Supreme Court has identified two requirements that it calls the "tests of experience and logic." *Id.* at 9; see also *In re Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1331-32 (D.C. Cir. 1985) (Scalia, J.). The "experience" inquiry looks to "whether the proceeding has historically been open." *Reporters Committee*, 773 F.2d at 1331. And the somewhat oddly-labeled "logic" inquiry asks "whether the right of access plays an essential role in the proper functioning of the judicial process and the government as a whole." *Id.* at 1332. Both tests must be

satisfied before we can conclude that the First Amendment provides a qualified right of access. *Id*.

Before trying to work through those questions, I note that the government doesn't contest the premise that the documents here are judicial records. Accordingly, I assume that they are—but it is by no means obvious. Merely filing a document with the district court isn't enough to transform it into a judicial document. See, e.g., *SEC v. AIG*, 712 F.3d 1, 3-4 (D.C. Cir. 2013). Absent a judicial decision, the documents filling district court dockets are no more than litigants' requests for action (or inaction). *United States v. El-Sayegh*, 131 F.3d 158, 162 (D.C. Cir. 1997). To become judicial records, the files must play some role in the adjudicatory process—i.e., in the judicial decision at hand. See *AIG*, 712 F.3d at 3 (quoting *El-Sayegh*, 131 F.3d at 163). Justice Holmes long ago articulated the basic reason in a somewhat different context:

> It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884), quoted in *Reporters Committee*, 773 F.2d at 1335.

Here it is unclear whether the district court "made [any] decisions about the[] [disputed recordings] or that otherwise relied on them." *AIG*, 712 F.3d at 4. What we do know is that Dhiab's attorneys attached *three* (of the more than thirty)

videos to a brief seeking a temporary restraining order and that the district court denied that TRO after a classified hearing. See Notice of Filing, *Dhiab v. Obama*, No. 05-1457 (GK) (June 14, 2014), ECF. No. 252; Order, *Dhiab v. Obama*, No. 05-1457 (GK) (June 16, 2014), ECF No. 254. But we don't know if those videos (or others) were played at the hearing or if they might have been understood as a basis for the district court's decision. And by the time the district court ruled on Dhiab's request for a preliminary injunction, the government had stopped performing forced cell extractions on him and so the district court offered no opinion on their legality. See *Dhiab v. Obama*, 74 F. Supp. 3d 16, 21 (D.D.C. 2014). Since videos that show only his extraction were thus irrelevant to the district court's adjudication of the remaining challenges, such recordings (if any) could not be judicial records. See *AIG*, 712 F.3d at 3–4; *El-Sayegh*, 131 F.3d at 163. Videos that include footage of the force feedings pose a closer question, but the answer is hardly clear. Nowhere in the district court's injunction opinion does it rely on the videos expressly. Indeed, the only mention of those recordings is in a quick recitation of the procedural history. 74 F. Supp. 3d at 20. While that opinion refers to certain government exhibits in discussing whether the feeding process is painful, it identifies those exhibits only by number, so we don't know whether they include the disputed videos. See *id*. at 25-26. Again, as the government didn't raise the argument, I proceed on the assumption that all of the disputed videos are judicial records and proceed to the task of divining the possible existence of a qualified First Amendment right of access.

\* \* \*

A preliminary concern is posed by our declaration several years ago that the "experience and logic test . . . has been limited to judicial proceedings that are part of the criminal

trial process" and that "[n]either the Supreme Court nor this court has *applied*" it outside that context. *Center for Nat'l Security Studies v. DOJ*, 331 F.3d 918, 935 (D.C. Cir. 2003) (emphasis added). But *Reporters Committee* proves otherwise; there we *applied* the test to documents used in civil summary judgment proceedings. It's true that we've never *found* a qualified First Amendment right outside the criminal context, but we've never categorically ruled it out either (and many other circuits have concluded that such a right exists in civil and even administrative matters, e.g., *N.Y. Civil Liberties Union v. N.Y.C. Trans. Auth.*, 684 F.3d 286, 297-98 (2d Cir. 2011)). And in *Center for National Security Studies* we noted that the records sought consisted of "*investigatory* information" not "information relating to a government *adjudicative* process," and, anticipating *El-Sayegh,* we saw that fact as precluding the application of the First Amendment access right. 331 F.3d at 936. In short, then, the fact that habeas proceedings are formally civil is no obstacle to use of the experience-and-logic framework.

That issue cleared aside, I next turn to the level of generality at which we should consider the "experience" bearing upon the proceedings or records in question. The Court has appeared to focus on the "particular proceeding in question," *Press-Enterprise*, 478 U.S. at 9, but without explaining whether we look to broad or narrow categories and without precluding focus on types of documents rather than proceedings. If proceedings are the subject of analysis, the likely categories here may range among civil actions generally, habeas actions, habeas actions relating to conditions of confinement, and finally habeas actions related to Guantanamo.

Despite the Supreme Court's apparent interest in the "proceedings," courts have often, where documents were at issue, turned directly to the documents in dispute, and applied

the "experience and logic" ideas to them.  See, e.g., *United States v. Erie County*, 763 F.3d 235, 241 (2d Cir. 2014); *In re Boston Herald, Inc.*, 321 F.3d 174, 182 (1st Cir. 2003); *United States v. Corbitt*, 879 F.2d 224, 229 (7th Cir. 1989).  And in *Reporters Committee*, we spoke initially of "proceedings," but then slipped seamlessly to addressing the type of documents sought.  773 F.2d at 1330-41.

One is tempted to dismiss all of this as immaterial, on the theory that we have a case of "pay me now or pay me later." If disclosure risks inflicting serious harm, it will emerge either in the assessment of experience and logic (here, for example, by focusing on Guantanamo habeas cases, dominated as they are by classified information), or as a trigger of the right's qualification (because the classified character of the documents meets the government's burden of showing a compelling need for secrecy).

Not so fast.  Intervenors point to *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982), where the Court applied its experience-and-logic tests to criminal trials generally, rejecting the state's effort to make the classification at the level of the testimony in question—that of a minor child in a sexual abuse case.  *Id.* at 605 n.13.  The Court made no claim that experience and logic dictated openness for that segment of the case.  But, turning to the government's burden, it rejected the claim that the interests for excluding the public were compelling.  Thus the parties claiming access had a fairly easy ride to showing experience and logic, and the government faced an uphill battle on its justification for privacy.  Resolving the level of generality affected not only who bore the burden of persuasion but also the severity of that burden.

Apart from choosing the level of generality at which to assess the "proceeding" (plus the choice between proceeding

and documents), the "experience" test requires a decision on what "history" is relevant. Yet we have no more guidance here. *Reporters Committee* tells us that a "historical tradition of at least some duration is obviously necessary," 773 F.2d at 1332, but doesn't tell us how long is long enough. As Judge Randolph notes, pre-ratification history is surely relevant, Randolph Op., Part II, at 11 n.12, but courts have plainly not seen the relevant history as limited to proceedings before 1791. *Press-Enterprise* itself relied exclusively on history that post-dated the First Amendment to some extent or another. Compare 478 U.S. at 10-12 & n.3 (considering 1807 treason trial of Aaron Burr and modern cases showing that most states required preliminary hearings be held in open court), with *id.* at 22-25 (Stevens, J., dissenting) (arguing that the inquiry should look to history "at the time the First Amendment was adopted," not those "recent common-law developments"). And unlike the plurality opinion in *Richmond Newspapers, Inc. v. Virginia*, which traced the history of trial access back to "the days before the Norman Conquest," 448 U.S. 555, 565 (1980), our decision in *Reporters Committee* relied heavily on late-nineteenth and early-twentieth century case law, 773 F.2d at 1332-36; see also *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700 (6th Cir. 2002) (collecting cases from the Third, Sixth, and Ninth Circuits relying on more recent history). Admittedly none of those decisions explicitly grappled with this question, but they at least raise doubt about stopping the historical clock at 1791.

Here the parties have neither provided a comprehensive history or sought to explain why only certain history is relevant. The government's historical analysis amounts to nothing more than a few citations to relatively recent cases and a brief discussion of the Classified Procedures Information Act of 1980. See App. Br. at 48-49. Intervenors were similarly cursory, citing a handful of mostly recent cases before jumping into their competing interpretation of CIPA.

See Intervenors' Br. at 27-28, 31-35 & nn.4, 7. But neither side tells us why those cases or CIPA might be relevant to the historical tradition. And—other than intervenors' throwaway citation to *Ex Parte Milligan*, 71 U.S. 2 (1886)—neither gives a hint of what the tradition of access was like pre-1970, much less pre-1791. Judge Randolph's opinion identifies evidence that a substantial portion (20%) of early English habeas cases were heard and decided privately. See Randolph Op., Part II, at 12 (citing PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 54, 56-57 (2010)). And that evidence appears persuasive. Besides, focus on such evidence has the advantage of being consistent with the idea that those who adopted the First Amendment meant to embody a pre-existing right of access to judicial proceedings and records. See *Richmond Newspapers*, 448 U.S. at 575-76. If that were the historical inquiry, all we'd need to know would be whether the access sought was available before 1791. See *Press-Enterprise*, 478 U.S. at 22 (Stevens, J., dissenting). But the cases don't demand any such focus or read the right so narrowly. Nor do they give any guidance on how to choose among potentially relevant time spans; we're left simply to guess at what history might be relevant.

We're similarly in the dark in terms of how consistent a tradition of openness must be within a given time span. The Court has told us that an "unbroken, uncontradicted history" will do the trick, *Richmond Newspapers*, 448 U.S. at 573, but has also found a qualified First Amendment right when there's a "*near* uniform [historical] practice," *Press-Enterprise*, 478 U.S. at 10 (emphasis added). But while its use of the word "near" tells us that the tradition can have gaps, we don't know how close to uniform the tradition needs to be. Perhaps, as Judge Rogers suggests, it's enough that the public historically had access at least 80% of the time. See Rogers Op. at 4. (Though most teachers would likely doubt the wisdom of calling a score of 80% "overwhelming.") On the other hand,

as Judge Randolph argues, it's certainly hard to say that there's "an unbroken, uncontradicted history" of public access when 20% of the cases were heard privately. See Randolph Op., Part II, at 12. Both positions seem reasonably grounded in the Court's precedents, but obviously both can't be right. Luckily, however, nothing in this case requires us to guess at how to resolve that troublesome issue, so it is enough for us to note the questions left unanswered by the Court's precedents.

Putting those doubts aside for a moment, at least one thing is clear: *If* the experience-and-logic framework is to be applied to Guantanamo habeas cases, at least the "logic" part—whether public access would play a significantly positive role in these proceedings—seems relatively easy. *Boumediene v. Bush* (and the standing protective orders for the Guantanamo cases) recognize that detainees litigating these cases have a practical need for classified information to contest the legality of their detention, see 553 U.S. 723, 784-86 (2008), a premise that in light of *Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014), extends to conditions of detention. But as the intervenors themselves recognize, the government could "oppose the disclosure of classified material as privileged under the state secrets doctrine," Intervenors' Br. at 35, and would have every reason to do so in light of its national-security concerns. Judge Randolph's discussion of *United States v. Reynolds*, 345 U.S. 1 (1953), and *Totten v. United States*, 92 U.S. 105 (1875), drives home the point that the government could short-circuit the entire Guantanamo habeas process by invoking that privilege and thereby depriving detainees (and also the courts) of potentially critical information. See Randolph Op., Part II, at 9-10, 14-15. (Indeed, since the criteria to classify information as "SECRET" appear to be more stringent than the privilege test we articulated in *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978), it seems likely that the government could withhold any information properly classified at that level.) It therefore

seems safe to say that disclosure would not play a positive role in those proceedings; to the contrary, it might substantially hollow them out, perhaps to the point of raising a Suspension Clause question.

\* \* \*

In short, then, under current understandings, choices as to level of generality for the relevant proceedings (and between proceedings and documents), and the scope of the relevant historical inquiry, can easily be decisive, both in shifting the burden of persuasive and in its rigor. Yet we have little guidance from the Supreme Court, or indeed any other, as to how to make those choices.

In this case, however, we can avoid these questions. Even if we are to apply a higher level of generality (perhaps habeas generally or even just civil matters) or to look to relatively recent history, and even if doing so would show experience and logic to lie on the intervenors' side, it is of no consequence—in view of our conclusion that the security interests invoked by the government are compelling (and no lesser remedy is available than preserving them from public access). I therefore join with my colleagues in reversing the district court.